**Daniel Snyder, OSB No. 783856**
dansnyder@lawofficeofdanielsnyder.com
**Carl Post, OSB No. 061058**
carlpost@lawofficeofdanielsnyder.com
**John Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

    Of Attorneys for Plaintiff


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION


| | |
|---|---|
| **MATTHEW W. ESKEW**, | Case No. 3:18-cv-01526 |
| Plaintiff, | **COMPLAINT** |
| v. | UNLAWFUL EMPLOYMENT ACTION |
| | Title VI Discrimination, Retaliation and supplemental state law claims |
| **PORTLAND STATE UNIVERSITY**, a public research university, and **REUBEN SIMOYI**, an individual, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I. PRELIMINARY STATEMENT

1.      Plaintiff brings this action to remedy violations of Plaintiff's statutory rights

under Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI"), as well as


PAGE 1 – COMPLAINT

supplementary state claims. Plaintiff seeks equitable relief as well as compensatory damages, attorneys' fees and costs.

## II. <u>JURISDICTION</u>

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. § 1343, civil rights jurisdiction.

3.      Plaintiff requests this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to all causes of action based on Oregon statutory provisions or common law as the state claims arise from the same nucleus of operative facts as the federal claims.

4.      All preconditions to jurisdiction pursuant to 42 U.S.C. § 2000e-5 have been satisfied.

      a.      On April 2, 2018, Plaintiff filed a charge of employment discrimination and retaliation with the Oregon Bureau of Labor and Industries (BOLI), case No. EEEMRC18042-10499 for Oregon Unlawful Employment Practice.

      b.      On April 6, 2018, BOLI co-filed a charge with the Equal Employment Opportunity Commission (EEOC), charge number 38D-2018-00428 for violation of Title VII of the Civil Rights Act of 1974.

      c.      On July 5, 2018, BOLI issued Plaintiff a right to sue letter for case No. EEEMRC18042-10499.

5.      On April 2, 2018, Plaintiff, through counsel, mailed a notice of tort claim to Defendant's Risk Manager.

6.      Venue is in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claim arose in this Judicial District.

PAGE 2 – COMPLAINT

### III. PARTIES

7.      Plaintiff Matthew Eskew (Plaintiff) is a citizen of the United States. At all times material, Plaintiff worked for Defendant Portland State University in Multnomah County, Oregon while Plaintiff was a graduate student pursuing a Ph.D. in chemistry.

8.      Defendant Portland State University (Defendant) is a public research university. Defendant does regular and sustained business in Oregon, including Multnomah County, Oregon. Defendant has its office and educational facilities in Portland, Oregon, where Plaintiff is employed and attends school.

9.      Defendant Portland State University has programs and activities for which it receives Federal funds or other Federal financial assistance.

10.      At all times material, Professor Reuben Simoyi was and is a tenured professor of physical chemistry. At all times material, Simoyi is employed by Portland State University and is assigned to the Chemistry Department. At all times material, Simoyi was Plaintiff's supervisor at work and also was in charge of Plaintiff's Ph.D. program. Only until August 2017. The false racism complaint occurred after I had left his supervision.

11.      At all times relevant, Defendant's employees and supervisors, Simoyi and Vusumuzi Sibanda, as their conduct is alleged herein were acting within the course and scope of their employment with Defendant.

### IV. GENERAL FACTUAL ALLEGATIONS

12.      Plaintiff is a Ph.D. candidate in physical chemistry at the Portland State University Chemistry Department. Simoyi accepted Plaintiff into the physical chemistry Ph.D. program. Plaintiff performed research for Simoyi in pursuit of his Ph.D. Plaintiff was also employed by Portland State University to teach professor Simoyi's classes.

13.      Simoyi is a native of Zimbabwe as is Sibanda. Simoyi also accepted Sibanda into the physical chemistry Ph.D. program. Sibanda was also employed by Portland State University.

PAGE 3 – COMPLAINT

14.    In January 2016, Plaintiff reported to Simoyi that Sibanda was not coming to work. After Plaintiff made this report, Sibanda began harassing and threatening Plaintiff.

15.    During spring term 2016, Plaintiff repeatedly made Simoyi aware that Sibanda was not showing up to campus and plagiarizing work. Sibanda was also told to observe the teaching of the CH444 Physical Chemistry Lab course and to pilot the experiments because he would be expected to teach this course the following year (Winter 2017). Sibanda never observed the teachings. Plaintiff was told by Simoyi not to worry about it and to just let Sibanda be.

16.    Sibanda insulted Plaintiff after Plaintiff told Simoyi that Sibanda was not coming into work. On January 25, 2016, Sibanda sent an email to Plaintiff in which he wrote, "I am done with you Cabron!" Sibanda sent the email in response to Plaintiff asking Sibanda for a short biography for the laboratory's website. "Cabron" is a Spanish language insult.

17.    On April 26, 2016, Sibanda sent an email in response to Plaintiff requesting material for a class with one word "Carbon!" It appears that Sibanda's word processing program autocorrected the word "Cabron" to "Carbon."

18.    After Plaintiff reported Sibanda's failure to attend work, Simoyi denied Plaintiff equipment to support his research. Simoyi said that there was no money to support his research. Lab funds were instead spent on Sibanda, in a pattern of favored treatment.

19.    Simoyi also invited three undergraduate students to perform research in the lab over the summer term of 2016. The expectation was for Sibanda and Plaintiff to share the laboratory. Sibanda was instructed to manage the three undergraduate students performing research in the laboratory while Plaintiff taught the first summer term of physical chemistry.

20.    During summer term 2016, Plaintiff reported to Simoyi that Sibanda was not showing up to work. Plaintiff also informed Simoyi that on one of the two days that Sibanda showed up on campus, Sibanda confronted Plaintiff, warning him to keep his mouth shut about whether or not he is on campus and to not tell Simoyi anything.

PAGE 4 – COMPLAINT

21.    After June 9, 2016, neither Sibanda nor Simoyi regularly appeared on campus. That left Plaintiff to manage three undergraduate students as well as perform his duties as a teaching assistant with no support.

22.    During the week of September 5, 2016, after not showing up for work all summer, Sibanda began to sporadically show up to work. After Sibanda returned to campus, Sibanda did not follow established safety protocols for working in the laboratory

23.    On September 9, 2016, after being repeatedly warned that Sibanda was improperly handling and storing chemicals on a bench not meant to have chemicals on it, a chemical spill occurred. Plaintiff pointed out to Sibanda that the spill could have been prevented and reminded Sibanda that he had been repeatedly asked to not have his chemicals on this bench. Sibanda said to Plaintiff to "Shut the f-ck up! You don't know shit and you can't tell me what to do. You are only the fearless leader because I do not want the position. I am far more qualified as a scientist and chemist." Sibanda also said that if Plaintiff even thought about moving Sibanda's chemicals that he would break Plaintiff equipment and destroy his chemicals. Sibanda said, "I should be in charge of this group as a Zimbabwean."

24.    Upon Simoyi's return to the country that fall, Plaintiff had an in-person meeting with him about the incident in the lab and with Sibanda. Simoyi told Plaintiff that he would take care of Sibanda. Simoyi said "all the Zimbabweans do what I tell them to since I am responsible for getting all the Zimbabweans that have graduated from Portland State into the country." Plaintiff requested that Simoyi ensure that Plaintiff was able to work free of harassment.

25.    During the weeks of September 26, 2016, and October 5, 2016, Simoyi requested that Plaintiff attend the Physical Chemistry classes that Simoyi was teaching that term. Plaintiff attended the classes as requested.  Simoyi very briefly introduced  Plaintiff  to the class, then said to the class "Matt (Plaintiff) is a complete Nazi!" In response to the shocked looks on the sixty to seventy students in the room, Simoyi then said "Yes, a Nazi." Simoyi then began to hold two fingers of his left hand up to his upper lip in mimic of Adolf Hitler's mustache and with his right

PAGE 5 – COMPLAINT

hand started to perform the "Sieg Heil" Nazi salute while boot stepping back and forth in front of the students. After performing this act, Simoyi instructed Plaintiff to leave.

26.     After the class, Plaintiff privately told Simoyi that he was very uncomfortable with Simoyi's characterization of him as a Nazi to the students. Simoyi said to Plaintiff, "Don't be so sensitive." During that meeting, Plaintiff also discussed with Simoyi his desire to remain in academia and work towards being a professor. Simoyi told Plaintiff that if he wanted a career in academia that he needed to make sure that he had a glowing recommendation from his advisor, Simoyi, and a clean record.

27.     Students that attended the class in which Simoyi referred to Plaintiff as a Nazi initiated a complaint with Defendant's Title IX office. At no time during this investigation was Plaintiff approached or interviewed by the Title IX office about the incident.

28.     During October and November 2016, Sibanda and Plaintiff were assigned to grade Simoyi's Physical Chemistry course. Numerous students requested a "regrade" of the exams and assignments that Sibanda graded. In response, Simoyi assigned Plaintiff to regrade all of the student exams and assignments, effectively doubling Plaintiff's work load.

29.     Simoyi was often absent from the university campus, typically not coming onto campus on any dates or times where he was not actively teaching. Simoyi's absence increased Sibanda's harassment of Plaintiff and created a hostile work and academic environment for Plaintiff. Sibanda's conduct included Sibanda a Stopped-Flow Spectrometer, a piece of equipment required for Plaintiff's research. Sibanda damaged the Stopped-Flow Spectrometer leaving the instrument on for 24 hours or more rather than turning it off. Sibanda also confronted Plaintiff in the laboratory and said, "Do not touch the fucking instrument. If I want to leave it on all day, every day, then that is what I will do. You are not to touch the instrument if I turn it on." When Plaintiff reported to Simoyi those hostile statements from Sibanda, Simoyi said, "Just ignore him and do your work."

PAGE 6 – COMPLAINT

30.    In December 2016, during the holiday break, Sibanda once again left the Stopped-Flow Spectrometer on and left for the day. Plaintiff went to Professor MW, Chairman of the Graduate Admissions and Advising Committee (GAAC). Plaintiff went to MW because Simoyi had left the country again on vacation. Plaintiff asked MW to observe him turning off the instrument, that there were no experiments being interrupted, and that he was not doing anything improper. It was during this interaction that Plaintiff informed MW about everything that had transpired in the Simoyi Lab in the previous six months. Plaintiff told MW that he was seriously worried about his future and safety due to the hostile environment. MW informed Plaintiff that it is not unheard of for students to switch advisors, but if Plaintiff hoped to stay in academia he really needed to avoid switching labs at all costs.

31.    Plaintiff reported theft to Simoyi. On December 27, 2016, while working in the lab, Plaintiff noticed papers with his handwriting on Sibanda's desk. Upon inspection, Plaintiff saw that they were lab reports from the physical chemistry lab course that he taught in Winter Term 2016. These lab reports had been located in a file folder with his private material in the back of his desk, thereby indicating that Sibanda had searched his desk. Plaintiff informed Simoyi through email about violation of the Portland State student records and privacy policy.

32.    At the end of December 2016 or in early January 2017, Simoyi had an in-person meeting with Plaintiff and said that "Dr. Mundoma," a former student of his from South Africa, asked as a personal favor that Simoyi admit Sibanda into Portland State University. Simoyi also informed Plaintiff that he "owes Dr. Mundoma too much to kick Vusumuzi Sibanda out of the program."

33.    Plaintiff reported more theft to Simoyi. On January 6, 2017, Plaintiff sent an email to Simoyi to let him know that a reference textbook was taken from his office.

34.    During 2016 and during the 2017 meetings of his course, Simoyi told students that Chemical Safety Splash Goggles are not required and that they do not have to wear them. Plaintiff had repeatedly asked Simoyi not to tell the students that as it is a huge safety hazard, a

PAGE 7 – COMPLAINT

direct contradiction to Portland State University Laboratory Policy, and greatly undermined Plaintiff's authority for mandating that students wear splash goggles in his lab. Despite Plaintiff's entreaty, Simoyi consistently told Plaintiff's students that they did not have to wear goggles.

36.     On January 20, 2017, at 2:00 p.m., Plaintiff met with Professor DIR, the Chair of the Chemistry Department, to inform him of the hostile working environment that had been ongoing in the Simoyi Lab and to discuss safety concerns in the teaching lab.

36.     On January 26, 2017, Plaintiff once again informed DIR that someone was going to get hurt in the lab. Simoyi held a meeting with Plaintiff  in which Simoyi warned Plaintiff that he would not tolerate Plaintiff going behind his back and that DIR has no authority with his laboratory. Simoyi also told Plaintiff that while he may not be Zimbabwean, Simoyi expects him to be like the Zimbabweans and to not do anything without his permission. During this meeting, Plaintiff told Simoyi that his work and education environment had become unhealthy. Simoyi again reiterated that if Plaintiff tried to leave his lab that he would have to start his Ph.D., program completely over and that his prospects of staying in academia would be nil. Plaintiff reported Simoyi's intimidating statements to MW and DIR.

37.     On February 7, 2017, Simoyi sent an email to the graduate students in the lab, as well as the undergraduate "MK," in which he wrote: "I had a visit from Title 9 officer (Diversity and inclusion) and they said my reference to the grader Matt as a Nazi offended them and did not show sensitivity. Something I felt was way below contempt.  Everyone had fun over this, even John Winner was trying for Matt's swastika.  I mentioned one time that I arrived into Brandeis as a 20-year old and immediately assimilated so that I do not come across as a 'goy', and became Jewish. No one can council (sic) me about being a Jew."

38.     On February 9, 2017, Plaintiff entered the teaching lab, immediately noticed a strong chemical smell in the lab space, and he started venting the area. When students began arriving, Plaintiff prohibited students from entering the lab space until he let the area vent. The

PAGE 8 – COMPLAINT

students informed Plaintiff that a student, MK, was hospitalized after chemical exposure during the morning section of the course.  Plaintiff learned that Sibanda created safety hazards in the lab. Sibanda did not instruct the students on proper handling of concentrated sulfuric acid, and had multiple groups performing the same experiment, despite there only being enough equipment for one group to perform it. Sibanda instructed the students to dump all their concentrated sulfuric acid waste into to a waste beaker that already held wasted halogenated solvents resulting in the release of dangerous, corrosive sulfuric acid and bromine vapors. Upon the release of the vapors, Sibanda failed to advise all students to evacuate the lab. Because MK was not informed of the hazard, she was exposed to harmful chemicals and injured. Sibanda created further safety hazards by instructing MK to go to the hallway and wait until she felt better rather than following the department chemical hygiene policy that should have resulted in MK, at a minimum, undergoing rinsing in the eye wash station. Sibanda created further safety hazards when after MK returned to the room complaining about her face burning, he told MK to go to the restroom to wash her face. Sibanda should have followed the procedures outlined in the chemical hygiene plan and immediately placed the student under the eye/face wash station or safety shower and contacted the University chemical stock room to arrange for medical attention.

39.    After this incident, Sibanda lied about what occurred in the lab and told a representative from the University Office of Environmental Health and Safety (EH&S) that MK was handling chemicals in the fume hood, that Sibanda instructed MK to leave the chemicals in the fume hood, that she ignored this instruction and removed the chemicals from the fume hood, and that she stuck her face over the beaker of chemicals leading to the exposure. None of those statements by Sibanda were truthful.

40.    MK informed Plaintiff that after she was injured in the lab that Sibanda called her on her personal mobile and tried to intimidate her into telling his version of what happened in the lab. MK told Plaintiff that she had not given Sibanda her mobile number and that he must have accessed the number by searching student records.

PAGE 9 – COMPLAINT

41.     On February 17, 2017, Simoyi sent an email to Plaintiff and Sibanda in which he wrote, "The Dean has mandated that we should meet and I table the minutes of that meeting." Simoyi also wrote "But, we have to go through the motions and absolve ourselves of any blame."

42.     Plaintiff, Simoyi, and Sibanda had a meeting to discuss safety issues and procedures for the lab. When Plaintiff brought up the safety issue of Sibanda lacking experience in the experiments he was instructing students to perform, and putting the students in an unsafe and hazardous risk, Sibanda got visibly upset and began yelling at Plaintiff and pointing his finger in his face. Simoyi's response to Sibanda's tirade was to say that he was not writing anything Plaintiff said down in his minutes of the meeting.

43.     During late February-March 2017, Simoyi had a private meeting with Plaintiff in his office where he once again listened to Plaintiff's complaints and concerns about his work, lab safety, and his ability to pursue his Ph.D. program in light of Sibanda's threats.  Simoyi told Plaintiff that if Plaintiff left Simoyi's supervision, Simoyi would not allow Plaintiff to take any of Plaintiff's research with him. Simoyi told Plaintiff that "You shouldn't worry, you are an American. Nothing bad will happen to you, not like if you were an African." Shortly after that, Plaintiff was called into meetings with DIR and Professor DA to discuss "your role in the lab accident."  DIR and DA told Plaintiff that Simoyi had made a claim that Plaintiff was responsible for the laboratory accident involving MK, although Plaintiff was not present when the incident occurred. Iwata-Reuyl said that Simoyi said that Plaintiff was actively trying to sabotage Sibanda's lab. Plaintiff told to DIR and DA that Simoyi and Sibanda's claims were not true and were in retaliation for his refusing to lie to the investigators about the circumstances of the lab accident.  During this meeting, Plaintiff told DIR that he had been physically intimidated by Sibanda during the closed-door meeting with Simoyi and Sibanda. To Plaintiff's best knowledge, DIR and DA did not take prompt action to protect Plaintiff at work and in education and to prevent further retaliation against him.

PAGE 10 – COMPLAINT

44.    On March 30, 2017, MW scheduled a meeting with Plaintiff. Plaintiff asked MW for assistance with the hostile work and educational environment in Simoyi's lab and for protection against future retaliation. MW warned Plaintiff not to involve any lawyers, as doing so would damage Plaintiff's career.

45.    On April 5, 2017, Plaintiff met with the University Incident Review Committee (IRC) about MK's accident. Prior to Plaintiff attending the IRC meeting, Simoyi instructed Plaintiff not to make any comments about the accident and to say that he had no knowledge of any safety issues. Plaintiff refused to lie during the IRC meeting. The IRC committee told Plaintiff that they thought he had done his best to ensure a safe laboratory environment. However, the IRC committee members told Plaintiff that they had heard allegations from Sibanda and Simoyi that Plaintiff was responsible for sabotaging the lab, thereby  causing the accident. Plaintiff told the IRC committee that there was a long-running hostile environment in the lab created by Sibanda and Simoyi, there was inequality in funding for his Ph.D. program, and that Simoyi was making threats about Plaintiff's Ph.D. program and research as leverage against him, including Simoyi's warnings to Plaintiff not to talk about the accident, Plaintiff  told the IRC committee about Simoyi's multiple statements in which he had referred to Plaintiff as a "Nazi." Plaintiff told the IRC committee that he was worried about retaliation for telling the truth during the IRC investigation and not telling the version of events that Simoyi told him to tell. The IRC committee told Plaintiff that the Dean of the Chemistry Department did not mandate that Simoyi meet with him on February 17, 2017, despite Simoyi's email. Plaintiff turned over email documentation to support his statements.

46.    On April 28, 2017, Plaintiff met with the Chemistry Department's GAAC.  The GAAC committee was composed of MW, NL, and DS. MW was the committee chair. The committee told Plaintiff that, "We have spoken to Professor Simoyi. He vowed to make your life miserable if you try to leave his lab, so we should find a way to keep you in his lab that works for both parties." The committee told Plaintiff that Simoyi was refusing to sign Plaintiff's GO-

PAGE 11 – COMPLAINT

16D form. The doctoral program must submit this form to the Office of Graduate Studies for the formation of a dissertation committee. If the supervising professor does not submit the form, a dissertation committee cannot be formed and the student does not advance to a Ph.D.

47.     On May 11, 2017, the GAAC sent an email to Sibanda, Simoyi, and Plaintiff blaming Plaintiff for allegedly playing a role in the hostile environment. GAAC encouraged Plaintiff to work from home to avoid harassment. Being assigned to work from home further interfered with Plaintiff's Ph.D. program, denying him physical lab support and equipment. This is also a violation of Plaintiff's right to equal access in education. In addition, the GAAC removed Plaintiff from his position teaching physical chemistry. Although the GAAC claimed that Plaintiff was only being removed from teaching the lab, the GAAC informed the Chemistry Department to remove Plaintiff from all physical chemistry assignments. Plaintiff then met with Simoyi in an attempt to find an amicable resolution to stay in Simoyi's Ph.D. program. Simoyi's response was to threaten Plaintiff with being kicked out of the Ph.D. program entirely.

48.     After Plaintiff's meeting with the GAAC committee, Simoyi retaliated against Plaintiff by deciding not to submit Plaintiff's revisions for the article at the Journal of Physical Chemistry. The retaliation of withholding Plaintiff's journal article was brought to the attention of the GAAC. After plaintiff reported this further retaliation, MW again informed Plaintiff that getting a lawyer involved would end any chance of him ever working in academia. MW made it clear that by getting a lawyer involved, Plaintiff would lose the support of the faculty and seriously jeopardize his career.

49.     On June 19, 2017, Professor GS joined Plaintiff in a meeting with DIR. They discussed that the GAAC's retaliated against Plaintiff by removing him from teaching the physical chemistry courses and that the committee had not taken action to assist him in his work, teaching, and in his Ph.D. program.

50.     On June 22, 2017, Plaintiff had a meeting with Julie Caron, an employee of Defendant in Defendant's Office of Global Diversity and Inclusion (OGDI). During that

PAGE 12 – COMPLAINT

meeting, Plaintiff informed Caron of the work, education harassment, and discrimination by Sibanda and Simoyi. Plaintiff gave Caron a copy of the email from Simoyi, confirming that he called Plaintiff a Nazi. Plaintiff asked Caron why no one came to talk to him about Simoyi's referring to him as a "Nazi" at work. Caron said that due to Simoyi's history of sexual harassment complaints, OGDI had its hands full focusing on Simoyi's sexual harassment of female students and had put Plaintiff's reports on the back burner. Plaintiff asked for support in being reassigned from Simoyi's supervision after a lack of action from the department.

51.    On July 5, 2017, although Simoyi knew that GAAC had advised Plaintiff to work from home, Simoyi sent Plaintiff a self-serving email attempting to create a derogatory record about Plaintiff. Simoyi wrote in the email, "Matt; I have no evidence of your work nor scholarship the last 8 months."

52.    On September 19, 2017, Caron asked Plaintiff to write a formal complainant against Simoyi. At that point, because of the GAAC's response and MW's repeated warnings, Plaintiff did not file a formal complaint against Simoyi fearing further retaliation.

53.    Plaintiff reported to Defendant that other graduate students had received comments from Sibanda and Simoyi about Plaintiff. Plaintiff reported that on October 2017, KM, a graduate student in the Chemistry Program, approached Plaintiff to say that Sibanda approached her and confessed that he felt bad about the way he had treated Plaintiff. KM told Plaintiff that Sibanda regretted the insulting things that he said to Plaintiff and regretted forcing Plaintiff out of the lab. Plaintiff reported that another graduate student, LL, also in the Chemistry Program, told Plaintiff that Simoyi said that he usually only accepts Africans into his lab because if they do something Simoyi doesn't like, he can send them back to Africa, but it's too hard to get rid of American students.

54.    Plaintiff reported to Defendant that another professor, KS, had heard Simoyi threaten Plaintiff. On October 12, 2017, Plaintiff learned from KS that he had heard Simoyi consistently levy insults towards Plaintiff and attempt to drag Plaintiff's name through the mud,

PAGE 13 – COMPLAINT

including saying insulting things about Plaintiff to other people in the hallways. This professor also told Plaintiff that, during the lab accident investigation, Simoyi attempted to blame the other professor for the accident by claiming that Simoyi had placed the other professor in charge of the lab since Simoyi was out of town.

55.    On October 16, 2017, Plaintiff told AB,  his current faculty adviser, about the smear campaign that Simoyi was running against him. AB told Plaintiff that Simoyi also tried to convince him that Plaintiff was an unreliable student among other insults and that the advisor should not take on Plaintiff as a student.

56.    On October 12, 2017, Sibanda filed a false complaint with OGDI in which he falsely claimed that Plaintiff discriminated against him on the basis of race. Sibanda also falsely claimed that Plaintiff had filed a Title IX complaint with OGDI about Sibanda. Defendant violated its own anti-retaliation and confidentiality policy by informing Sibanda of Plaintiff's prior meeting with OGDI.  During the OGDI investigation over Sibanda's own complaint, Simoyi lied to the investigator, falsely claiming that Plaintiff went on a campaign to get Sibanda kicked out of the chemistry Ph.D., program, claiming that Plaintiff ran a campaign of misinformation, that Plaintiff withheld a lab manual, that Plaintiff failed to communicate information in the lab manual to Sibanda, that Plaintiff "sabotaged" Sibanda's lab causing the lab accident, and that Plaintiff reported the lab accident so as to damage Sibanda.

57.    On December 12, 2017, the OGDI issued a report on Sibanda's claims of racism against Plaintiff. OGDI found that Sibanda's allegations were not supported by evidence, there was no discriminatory action by Plaintiff, and it is credible that Sibanda's complaint may have been brought in bad faith. Plaintiff was not notified of the report until January 29, 2018.

58.    On February 19, 2018, Plaintiff formally filed a Title IX complaint against Simoyi with Defendant's OGDI for retaliation. To Plaintiff's best knowledge, the complaint is open but OGDI has not finalized their investigation.

PAGE 14 – COMPLAINT

59.     On February 16, 2017, Plaintiff contacted Dean Dana Walton-Macaulay, the Dean of Student Life, and made a request that Walton-Macaulay investigate Sibanda's false complaints to OGDI.  Walton-Macualay interviewed only Sibanda, Simoyi, a lab volunteer, TW, who was not present when these incidents occurred, and another unknown colleague. To Plaintiff's best knowledge, Walton-Macaulay did not follow the procedures for investigation of a report of false complaint. Walton-Macaulay did not interview a single independent witness that OGDI had identified in its report. On March 30, 2018, Walton-Macaulay told Plaintiff that she had closed her investigation without making a finding against Sibanda.

60.     On April 12, 2016, Professor KS had a conversation with Plaintiff and confirmed rumors that Plaintiff had been hearing around the department that Simoyi was actively meeting with the Chair of the Department, DIR to get Plaintiff removed from the department. KS told Plaintiff that Simoyi came into KS's office and was complaining that the department had not taken action against Plaintiff and that the department needed to deal with their "Matt problem," referring to Plaintiff. KS's report to Plaintiff of Simoyi's retaliation was a report similar reports that Plaintiff had heard from other members of the department that Simoyi wanted Plaintiff out of the department and Ph.D. program. Plaintiff reported Schwartz's reports to him to OGDI investigator, Banafsheh "Violet" Nazari, JD.

## FIRST CLAIM FOR RELIEF

### (Title VI - 42 U.S.C. § 2000d)

61.     Plaintiff re-alleges all relevant paragraphs as though fully set forth herein.

62.     At all times material, Defendant was and is a recipient of federal financial assistance for its programs and activities.

63.     In violation of 42 U.S.C. § 2000d, Defendant discriminated against Plaintiff because of his race, national origin, for whistleblowing, and for reporting unlawful conduct. Additionally, Defendant retaliated against Plaintiff for opposing discrimination.

**Law Offices of Daniel Snyder**
Attorneys At Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

64.     As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

## SECOND CLAIM FOR RELIEF

### (ORS 659.850 Discrimination in education prohibited)

65.     Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

66.     At all times material, Plaintiff was a student enrolled in higher education in Oregon.

67.     Defendant subjected Plaintiff to discrimination in higher education program, services, and school activities as alleged above based on race, national origin, whistleblowing, and reporting unlawful conduct.

68.     Defendant and its programs and services are financed in whole or in part by moneys appropriated by the Legislative Assembly.

## THIRD CLAIM FOR RELIEF

### (ORS 659.852 – Retaliation against student in education prohibited)

69.     Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

70.     Defendant is a public university listed in ORS 352.002.

71.     At all times material, Plaintiff was a student of an education program.

72.     Plaintiff reported information to Defendant that he believed is evidence of a violation of a state or federal rule based on race, national origin, whistleblowing, and reporting unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### (Title VII Civil Rights Act of 1964, 42 U.S.C. § 2000e-2)

### Count I – Race and National Origin Discrimination

73.     Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

74.     At all material times, Defendant was an employer within the meaning of 42 U.S.C. § 2000e (b).

PAGE 16 – COMPLAINT

75.     Defendant discriminated against Plaintiff with respect to the terms and conditions of his employment because of his race and national origin.

### Count II – Race and National Origin Retaliation

76.     Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

77.     At all material times, Defendant was an employer within the meaning of 42 U.S.C. § 2000e (b).

78.     Defendant discriminated and retaliated against Plaintiff with respect to the terms and conditions of his employment because Plaintiff opposed discrimination based on his race and national origin.

### FIFTH CLAIM FOR RELIEF

### (ORS Chapter 659A.030)

79.     Plaintiff re-alleges all relevant paragraphs as though fully set forth herein.

80.     In violation of ORS 659A.030, Defendant discriminated against Plaintiff because of his race and national origin. Additionally, Defendant retaliated against Plaintiff for opposing unlawful practice.

81.     As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

### SIXTH CLAIM FOR RELIEF

### (ORS Chapter 659A.199 – Whistleblower)

82.     Plaintiff re-alleges all relevant paragraphs as though fully set forth herein.

83.     Plaintiff reported to Defendant conduct that Plaintiff believed was evidence of a violation of state or federal law, rule, or regulation.

84.     Defendant discriminated and retaliated against Plaintiff because of the reports made by Plaintiff.  Defendant's actions violated ORS 659A.199, are an unlawful employment practice, and caused Plaintiff economic and non-economic damages.

PAGE 17 – COMPLAINT

85.    As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

## SEVENTH CLAIM FOR RELIEF

## (ORS Chapter 659A.203 – Whistleblower)

86.    Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

87.    Plaintiff reported to Defendant conduct that Plaintiff believed was evidence of a violation of state or federal law, rule, or regulation.

88.    Defendant discriminated and retaliated against Plaintiff because of the reports made by Plaintiff.  Defendant's actions violated ORS 659A.203, are an unlawful employment practice, and caused Plaintiff economic and non-economic damages.

89.    As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

## DAMAGES

90.    Plaintiff is entitled to equitable relief, including, but not limited to, a declaration that Defendant violated Plaintiff's statutory rights, the rights to publish the work that Plaintiff completed while working in Simoyi's lab, and an injunction prohibiting further discrimination and retaliation.

91.    Plaintiff is entitled to an award for past lost wages and benefits and future lost earnings, benefits, and lost earning capacity, and other compensatory damages for past and future pecuniary losses. Plaintiff should be awarded economic damages in an amount determined fair by a jury.

92.    Plaintiff is entitled to non-economic damages sufficient to compensate Plaintiff for emotional distress and other non-pecuniary losses in an amount to be proved at trial. Plaintiff should be awarded non-economic damages in an amount determined fair by a jury.

93.    The Court should enter an order declaring that Defendant violated the law.

PAGE 18 – COMPLAINT

94.      To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

95.      Pursuant to 42 U.S.C § 1988, ORS Chapter 659A, ORS 20.107, Plaintiff is entitled to recover his reasonable attorneys' fees and costs, including expert witness fees.

96.      Plaintiff is entitled to post-judgment interest on all damages, costs, expenses, and fees from the date of judgment until the date paid.

### PRAYER FOR RELIEF

Plaintiff prays for the following judgment against Defendant:

1.      A sum which will fully compensate Plaintiff for Plaintiff's non-economic damages in a sum that is just as determined by a jury;

2.      A sum which will fully compensate Plaintiff for Plaintiff's economic damages in a sum that is just as determined by a jury;

3.      Equitable relief, including but not limited to, reinstatement if Plaintiff so chooses;

4.      Plaintiff's costs and disbursements incurred herein;

5.      Plaintiff's attorneys' fees; and

6.      For such other and further relief as the Court may deem just and equitable.

**Plaintiff demands a trial by Jury.**

Dated: August 17, 2018

**Law Offices of Daniel Snyder**

  _/s/ Daniel Snyder_
Daniel Snyder, OSB No. 783856
dansnyder@lawofficeofdanielsnyder.com
Carl Post, OSB No. 06105
carlpost@lawofficeofdanielsnyder.com
John David Burgess, OSB 106498
johnburgess@lawofficeofdanielsnyder.com
Tel: (503) 241-3617 / Fax: (503) 241-2249

Of Attorneys for Plaintiff

PAGE 19 – COMPLAINT